**ELECTRONICALLY FILED**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | | |
|---|---|---|
| GENERAL ELECTRIC COMPANY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:04-CV-401-TBR |
| | ) | |
| ANSON STAMPING COMPANY, INC., ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |
| | ) | |
| STAMTEC, INC., | ) | |
| | ) | |
| Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LEASING ONE CORPORATION | ) | |
| AND | ) | |
| JPMORGAN CHASE BANK, N.A. | ) | |
| f/k/a BANK ONE, KENTUCKY, N.A., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM IN RESPONSE TO LEASING ONE CORPORATION'S
### MOTION FOR SUMMARY JUDGMENT

Plaintiff, JPMorgan Chase Bank, N.A. f/k/a Bank One, N.A., f/k/a Bank One, Kentucky, N.A. ("Chase"), by counsel, hereby submits this memorandum in response to the Motion for Summary Judgment of Leasing One Corporation ("Leasing One").

## INTRODUCTION

At issue in this case is the priority of liens of Chase and Leasing One in and to the GE Proceeds.[1]  Both Chase and Leasing One have filed motions for summary judgment.[2]  In its motion, Leasing One seeks judgment determining that the Stamping Commercial Security Agreement, the Stamping Guaranty, and Stamping Security Agreement (collectively, the "Stamping/Chase Transactions") are void *ab initio* as fraudulent transfers under KRS 378.010 and KRS 378.020, (collectively, the "Fraudulent Transfer Claims"), and, therefore, do not afford to Chase the superior right to the GE Proceeds.  Further, Leasing One seeks summary judgment that its own claimed lien on the GE Proceeds is not void *ab initio* as a fraudulent transfer under KRS 378.010.

Leasing One is not entitled to summary judgment in its favor on its Fraudulent Transfer Claims whether based on KRS 378.010 or KRS 378.020.  As will be discussed below, Leasing One's arguments employ incorrect legal standards and ignore genuine issues of material fact precluding summary judgment in Leasing One's favor.  More importantly, however, is Leasing One's wholesale failure to view these transactions for what they are—part and parcel of contemporary financing practices employed by commercial lenders each and every day around the world—practices which the Kentucky Legislature and the Kentucky courts have acknowledged and approved, even in the context of KRS 378.010 and KRS 378.020.

---

[1] All capitalized terms used herein shall have the meaning assigned to them in the Memorandum in Support of JPMorgan Chase Bank's Motion for Summary Judgment filed by Chase, at docket 151.

[2] Chase seeks summary judgment that Leasing One's fraudulent transfer claims are barred by the statute of limitations.  If successful in that argument, Leasing One's Motion for Summary Judgment is moot with respect to the issues involving the Stamping/Chase Transactions.

## STANDARDS

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The movant has the burden of establishing that there are no genuine issues of material fact." *Hunley v. DuPont Auto.*, 341 F.3d 491, 496 (6th Cir. 2003). Once the moving party demonstrates an absence of a genuine issue of material fact, the burden shifts to the non-moving party to "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *Arendale v. City of Memphis*, 519 F.3d 587, 593 (6th Cir. 2008). In reviewing a motion for summary judgment, the court views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Prebilich-Holland v. Gaylord Entertainment Co.*, 297 F.3d 438, 442 (6th Cir. 2002).

### Burden of Proof

Leasing One, as the party who seeks to set aside a conveyance as fraudulent, bears the ultimate burden of persuasion with respect to the claimed fraudulent conveyances. *Myers Dry Goods Co. v. Webb*, 296 Ky. 696, 181 S.W.2d 56, 58 (1944). The person who claims a transaction is intentionally fraudulent[3] under KRS 378.010 provides circumstantial evidence of

---

[3] The burden shifting analysis associated with badges of fraud is technically only relevant as to intentionally fraudulent conveyances under KRS 378.010, as a constructively fraudulent conveyance under KRS 378.020 does not require evidence of fraudulent intent, only lack of valuable consideration. *See Kitchen v. Fischer*, 293 Ky. 787, 170 S.W.2d 592, 593 (Ky. 1943); *Campbell v. First Nat. Bank of Barbourville*, 234 Ky. 697, 27 S.W.2d 975,977 (Ky. 1930) ("A gift of one's property is fraudulent as to existing creditors regardless of his intent.").

(continued...)

fraudulent intent by reference to "badges of fraud." *See Russell County Feed Mill, Inc. v. Kimbler*, 520 S.W.2d 309, 311 (Ky. 1975). After sufficient proof of a number of "badges of fraud" has been demonstrated, the person defending the transaction then has an evidentiary burden to produce evidence to rebut the inferences of fraudulent intent created by the badges and establish the bona fides of the transaction. *See id.*; *Myers Dry Goods*, 181 S.W.2d at 702. If the person defending the transaction offers such evidence, a directed verdict is avoided and the person challenging the transaction must meet the ultimate burden of persuasion—i.e. the person who challenges the transaction as fraudulent must establish the fraud by clear and convincing evidence. *Hickman Bank & Trust Co. v. Pickard & Mayberry*, 207 Ky. 772, 270 S.W. 30, 32 (1925); *see Russell County Feed*, 520 S.W.2d at 311; *Myers Dry Goods*, 181 S.W.2d at 702.

Thus, to prevail on its claims to set aside transfers under KRS 378.010, Leasing One must demonstrate that no genuine issue of material fact exists with respect to: (a) Stamping's intent to delay, hinder or defraud its creditors by the transfers in question, and (b) Chase's notice of such intent. *See Allen v. Ligon*, 194 S.W. 1050, 1051 (Ky. 1917). As for its claims under KRS 378.020, Leasing One must demonstrate that no genuine issue of material fact exists that

---

(...continued)

Nonetheless, as to questions of indirect benefits, see *infra* at II.B, courts in the Sixth Circuit employ a similar burden-shifting approach. *See Nat'l Century Financial Enters., Inc. v. Biomar Technologies, Inc. (In re Nat'l Century Financial Enters., Inc.)*, 341 B.R. 198, 216-17 (Bankr. S.D. Ohio 2006). Rather than demonstrating that sufficient badges of fraud exist, the person challenging the transfer must show that no direct benefit was received. *Id.* Nonetheless, the ultimate burden remains with the person challenging the transfer. *Id.* ("Thus, it is clear that the bankruptcy court never truly shifted the ultimate burden of proof on the issue to the Bank. Rather, it required the debtor to produce evidence that it received no direct benefit for the pledge of assets. Leasing having done so by showing that the loan proceeds went to a third party, the bankruptcy court then required the Bank to meet this evidence with some proof that Leasing received an indirect benefit from the loan.")

the transactions in question were "without valuable consideration." *See Schilling v. Montalvo (In re Montalvo)*, 333 B.R. 145, 149 (Bankr. W.D. Ky. 2005).

## UNDISPUTED FACTS

### The Term Note

1.     On September 29, 1999, Anson Industries, LLC ("Industries"), Anson Machine & Manufacturing, LLC ("Machine"), and Jaggers Equipment Company, Inc. ("Jaggers") jointly and severally entered into a Term Note ("Term Note") to the order of Chase, formerly Bank One, N.A., or Bank One Kentucky, N.A., in the face principal amount of $1,345,550.00. *See* **Exhibit 2**, Affidavit of Albert Stephen Cooper, (**"Cooper Affidavit"**), and Exhibit B attached thereto.

2.     Contemporaneous with the execution of the Term Note, Machine executed and delivered to Chase an Amended and Restated Security Agreement ("Machine Security Agreement") dated September 29, 1999, pledging substantially all of the assets of Machine and the proceeds of same ("Machine Collateral"), to secure the "Secured Obligations" as defined in the Machine Security Agreement, including indebtedness evidenced by the Term Note. *See* **Cooper Affidavit** and Exhibit C attached thereto.

3.     In order to perfect the security interest of Chase in the Machine Collateral as defined in the Machine Security Agreement, Machine made and delivered to Chase a UCC-1 Financing Statement naming Machine as debtor and Chase as secured party. The UCC-1 was filed of record in the Jefferson County Clerk's Office on September 25, 1999, as File #99-07256. Such UCC-1 has been continuously filed of record with a filing in the Office of the Secretary of State on September 8, 2004 under File No. 2004-2038113-74. *See* **Cooper Affidavit** and Exhibit D attached thereto.

5

4.      Contemporaneous with the execution of a Second Amendment to Borrower Documents dated November 15, 2000, which extended the maturity date of the Term Note and modified other provisions of various documents entered into in connection with the Term Note, Stamping executed and delivered to Chase a Guaranty ("Stamping Guaranty") dated November 15, 2000.  On the face of the Stamping Guaranty, Stamping gave an unconditional, joint and several and absolute guarantee of payment and performance to Chase of the indebtedness evidenced by the Term Note.  *See* **Cooper Affidavit** and Exhibit E attached thereto.

5.      Contemporaneous with the execution of the Stamping Guaranty, Stamping executed and delivered to Chase a Security Agreement ("Stamping Security Agreement") dated November 15, 2000, pledging substantially all of the assets of Stamping and the proceeds of same, including the GE Proceeds (the "Stamping Collateral"), to secure the obligations of Stamping under the Stamping Guaranty and the other "Secured Obligations" as defined in the Stamping Security Agreement.  *See* **Cooper Affidavit** and Exhibit F attached thereto.

6.      In order to perfect the security interest of Chase in the Stamping Collateral as defined in the Stamping Security Agreement, Stamping made and delivered to Chase a UCC-1 Financing Statement naming Stamping as debtor and Chase as secured party.  The UCC-1 was filed of record in the Jefferson County Clerk's Office on December 15, 2000, as File #00-10079. *See* **Cooper Affidavit** and Exhibit G attached thereto.  Such UCC-1 has been continuously filed of record by the filing bearing File No. 2002-1875514-15 filed in the Office of the Secretary of State on October 15, 2002, which was continued on May 22, 2007.  *See* **Cooper Affidavit** and Exhibit G-1 attached thereto.

7.    Through a series of amendments executed by the parties, the maturity date of the Term Note was extended to December 2, 2001. *See* **Cooper Affidavit**.

8.    Chase is the owner and holder of the Term Note, the Machine Security Agreement, the Stamping Guaranty, and the Stamping Security Agreement. *See* **Cooper Affidavit**.

9.    Industries and Machine are in default under the terms of the Term Note. *See* **Cooper Affidavit**.

10.    Machine is in breach of the terms of the Machine Security Agreement. *See* **Cooper Affidavit**.

11.    Stamping is in breach of the terms of the Stamping Guaranty and the Stamping Security Agreement. *See* **Cooper Affidavit**.

12.    On or about February 28, 2007, Chase obtained a State Court judgment against the Anson Entities on the Term Note (the "Judgment") in the amount of $1,162,219.20, with prejudgment interest thereon at the rate of prime plus 3% from February 19, 2007, until the date of the judgment, and post-judgment interest to accrue thereon at the rate of 12% per annum until paid, which retained the case on the docket for further proceedings including a motion by Chase to supplement the Judgment with an award of attorneys fees and costs in collecting the Judgment. *See* **Cooper Affidavit** and Exhibit H attached thereto.

13.    Industries, Machine, and Stamping have failed to satisfy the Judgment. *See* **Cooper Affidavit**.

### The Revolving Credit Note

14.     On September 29, 1999, Industries, Machine, and Jaggers jointly and severally entered into a Revolving Credit Note ("Revolving Credit Note") to the order of Chase in the face principal amount of $1,450,000.00. *See* **Cooper Affidavit** and Exhibit I attached thereto.

15.     Contemporaneous with the execution of the Revolving Credit Note, Machine executed and delivered to Chase the Machine Security Agreement dated September 29, 1999 pledging the Machine Collateral, to secure the "Secured Obligations" as defined in the Machine Security Agreement, including the indebtedness evidenced by the Revolving Credit Note. *See* **Cooper Affidavit** and Exhibit C attached thereto.

16.     In order to perfect the security interest of Chase in the Machine Collateral as defined in the Machine Security Agreement, Machine made and delivered to Chase a UCC-1 Financing Statement naming Machine as debtor and Chase as secured party. The UCC-1 was filed of record in the Jefferson County Clerk's Office as File #99-07256. Such UCC-1 has been continuously filed of record with a filing in the Office of the Secretary of State on September 8, 2004, under File No. 2004-2038113-74. *See* **Cooper Affidavit** and Exhibit D attached thereto.

17.     Contemporaneous with the execution of a Second Amendment to Borrower Documents dated November 15, 2000, which extended the maturity date of the Revolving Credit Note and modified other provisions of various documents entered into in connection with the Revolving Credit Note, Stamping executed and delivered to Chase the Stamping Guaranty dated November 15, 2000. On the face of the Stamping Guaranty, Stamping gave an unconditional, joint and several and absolute guarantee of payment and performance to Chase of the indebtedness evidenced by the Revolving Credit Note. *See* **Cooper Affidavit** and Exhibit E attached thereto.

18.    Contemporaneous with the execution of the Stamping Guaranty, Stamping executed and delivered to Chase the Stamping Security Agreement dated November 15, 2000, pledging the Stamping Collateral, including the GE Proceeds, to secure the obligations of Stamping under the Stamping Guaranty Agreement and the other "Secured Obligations" as defined in the Stamping Security Agreement. *See* **Cooper Affidavit** and Exhibit F attached thereto.

19.    In order to perfect the security interest of Chase in the "Stamping Collateral" as defined in the Stamping Security Agreement, Stamping made and delivered to Chase a UCC-1 Financing Statement naming Stamping as debtor and Chase as secured party. The UCC-1 was filed of record on December 15, 2000 in the Jefferson County Clerk's Office as File #10079. *See* **Cooper Affidavit** and Amended Exhibit G attached thereto. File #10079 has been continuously maintained of record with an in lieu filing in the Office of the Secretary of State on October 15, 2002, bearing File No. 2002-1875514-15, which was continued on May 22, 2007. *See* **Cooper Affidavit** and Exhibit G-1 attached thereto.

20.    Through a series of amendments executed by the parties, the maturity date of the Revolving Credit Note was extended to December 2, 2001. *See* **Cooper Affidavit**.

21.    Effective as of January 1, 2001, Industries, Machine, Jaggers, Anson and Chase entered into a Third Amendment to Borrower Documents pursuant to which the obligations of Jaggers under the terms of the Revolving Credit Note were discharged. *See* **Cooper Affidavit**.

22.    Chase is the owner and holder of the Revolving Credit Note, Machine Security Agreement, Stamping Guaranty and Stamping Security Agreement. *See* **Cooper Affidavit**.

23. Industries and Machine are in default under the terms of the Revolving Credit Note. *See* **Cooper Affidavit**.

24. Machine is in breach of the terms of the Machine Security Agreement. *See* **Cooper Affidavit**.

25. Stamping is in breach of the terms of the Stamping Guaranty and the Stamping Security Agreement. *See* **Cooper Affidavit**.

26. On or about February 28, 2007, Chase obtained a State Court judgment against the Anson Entities on the Revolving Credit Note (the "Judgment") in the amount of $1,878,086.03, with prejudgment interest thereon at the rate of prime plus 3% from February 19, 2007, until the date of the judgment, and post-judgment interest to accrue thereon at the rate of 12% per annum until paid, which retained the case on the docket for a further proceedings including a motion by Chase to supplement the Judgment with an award of attorneys fees and costs in collecting the Judgment. *See* **Cooper Affidavit** and Exhibit H attached thereto.

27. Industries, Machine, Stamping, and Anson have failed to satisfy the Judgment. *See* **Cooper Affidavit**.

### Stamping Revolving Note

28. On December 24, 1999, in connection with the agreement of Chase to loan funds to Stamping, Stamping executed a Promissory Note payable to the order of Chase in the face principal amount of $1,000,000.00 ("Stamping Revolving Note"). *See* **Cooper Affidavit**.

29. To secure the loan represented by the Stamping Revolving Note, Stamping executed and delivered to Chase a Commercial Security Agreement ("Stamping Commercial Security Agreement") dated December 24, 1999, pledging the Stamping Collateral, to secure the "Indebtedness" as defined in the Stamping Commercial Security Agreement, including the

indebtedness evidenced by the Stamping Revolving Note.  *See* **Cooper Affidavit** and Exhibit J attached thereto.

30.    On April 30, 2000, Stamping entered into a Promissory Note constituting a renewal and extension of the Stamping Revolving Note.  *See* **Cooper Affidavit** and Exhibit K attached thereto.

31.    The loan represented by the Stamping Note was fully funded.  *See* Leasing One Amended Cross-claim, ¶ 15-17.

32.    Pursuant to the Stamping Commercial Security Agreement, "Indebtedness" is defined to include the Stamping Guaranty of the obligations of Industries and Machine under the Term Note and the Revolving Credit Note.  It includes, in addition to the Stamping Revolving Note, "all other obligations, debts, and liabilities, plus any accrued interest thereon, owing by Grantor, . . . to Lender of any kind or character, now existing or hereafter arising, as well as all present and future claims by Lender against [Stamping] . . . , and all renewals, extensions, modifications, substitutions and arrangements of any of the foregoing, whether such Indebtedness arises by note, draft, acceptance, *guaranty*, endorsement, letter of credit, assignment, . . ." (Emphasis added.)  *See* Exhibit J to **Cooper Affidavit**.

33.    In order to perfect the security interest of Chase in the Stamping Collateral as defined in the Stamping Commercial Security Agreement, Stamping made and delivered to Chase a UCC-1 Financing Statement naming Stamping as debtor and Chase as secured party. The UCC-1 was filed of record in the Jefferson County Clerk's Office on May 8, 2000, as File # 00-03702, and has been continuously perfected by the filing of an in lieu statement on

October 15, 2002, in the Office of the Secretary of State bearing File No. 2002-1875529-81, which was continued on May 22, 2007. *See* **Cooper Affidavit** and Exhibit L attached thereto.

34.    Through a series of amendments executed by the parties, the maturity date of the Stamping Revolving Note was extended to December 2, 2001. *See* **Cooper Affidavit**.

35.    Chase is the owner and holder of the Stamping Revolving Note and the Stamping Commercial Security Agreement. *See* **Cooper Affidavit**.

36.    Stamping is in default under the terms of the Stamping Revolving Note as a result of the indebtedness evidenced by the same having become due on December 2, 2001. *See* **Cooper Affidavit**.

37.    The default under the Stamping Revolving Note also is an Event of Default under the terms of the Stamping Commercial Security Agreement. *See* **Cooper Affidavit** and Exhibit J attached thereto.

38.    On or about February 28, 2007, Chase obtained a State Court judgment against the Anson Entities on the Stamping Revolving Note (the "Judgment") in the amount of $658,430.80, with prejudgment interest thereon at the rate of prime plus 3% from February 19, 2007, until the date of the judgment, and post-judgment interest to accrue thereon at the rate of 12% per annum until paid, which retained the case on the docket for further proceedings including a motion by Chase to supplement the Judgment with an award of attorneys fees and costs in collecting the Judgment. *See* **Cooper Affidavit** and Exhibit H attached thereto.

39.    Stamping has failed to satisfy the Judgment. *See* **Cooper Affidavit**.

## Leasing One Corporation

40.    Leasing One is a wholly owned subsidiary of Farmers Bank. *See* **Exhibit 3, Deposition of Mark W. Lester ("Lester Deposition")**, p. 6 through p. 9.

41.     Mark Lester is, and has been, the Vice President of Sales for Leasing One Corporation for approximately 15 years. *See* **Exhibit 3**, p. 6 through p. 9.

42.     Charles J. Mann was President of Leasing One from July of 1993 through January of 2008.  Prior to July, 1993, he was President of the leasing subsidiary for Bank of Louisville. *See* **Exhibit 4, Deposition of Charles J. Mann ("Mann Deposition")**, p. 5.

43.     Leasing One pursues creditworthy individuals who need to finance purchases of heavy or high-tech equipment. *See* **Mann Deposition**, p. 7, line 19-21.

44.     On or about November 1, 1999, Leasing One entered into a Commercial Lease Agreement No. 001-0000953-001 with Stamping. *See* **Lester Deposition**, p. 40, line 13 through p. 42, line 5, and Exhibit 3 thereto.

45.     On or about June 15, 2000, Leasing One entered into a Commercial Lease Agreement no. 001-0000953-002 with Stamping. *See* **Lester Deposition**, p. 47, line 22 through p. 48, line 20, and Exhibit 4 thereto.

46.     On or about June 15, 2000, Leasing One entered into a Commercial Lease Agreement No. 001-0000953-003 with Stamping. *See* **Lester Deposition**, p. 50, line 5 through line 20, and Exhibit 5 thereto.

47.     On or about August 23, 2000, Leasing One entered into a Commercial Lease Agreement No. 001-0000953-004 with Stamping. *See* **Lester Deposition**, p. 52, line 22 through p. 57, line 1, and Exhibit 6 thereto.

48.     At the time Stamping and Leasing One entered into the Commercial Lease Agreements, which was between November 1, 1999, and August 23, 2000, Leasing One believed Stamping was solvent, creditworthy, sufficiently capitalized, and that the GE contract was the

primary source of revenues for Stamping. *See* **Lester Deposition**, p. 57, line 4 through p. 60, line 11. *See* **Mann Deposition**, p. 60, line 21 through 61, line 7.

49.     As a result of disputes between Stamping and GE, Stamping and GE entered into an arbitration proceeding. *See* Magistrate's Recommended Findings of Fact and Conclusions at Docket 26.

50.     In 2001, before the Commercial Lease Agreements were satisfied in full, Stamping defaulted on the amounts owed under the Commercial Lease Agreements. *See* Leasing One's Amended Cross-Claim, ¶ 5.

51.     On September 13, 2002, Leasing One filed suit against Stamping and its guarantor, John Anson, in the Jefferson Circuit Court, seeking a money judgment against both for the amounts due under the Commercial Lease Agreements. *See* Leasing One's Amended Cross-claim, ¶ 6; Record, Case No. 02-CI-06915, Jefferson Circuit Court, *Leasing One Corporation vs. Anson Stamping, LLC, et al.*

52.     By 2002, Anson Stamping was effectively shut down. *See* **Mann Deposition**, p. 50 through p. 53, line 6.

53.     By June, 2003, Leasing One had obtained two judgments against Stamping in the aggregate amount of approximately $684,000, with interest accruing at the then judgment rate. *See* Leasing One's Amended Cross-claim, ¶ 6.

54.     On June 17, 2003, Stamping executed a Security Agreement in favor of Leasing One granting to Leasing One a security interest in substantially all of its assets, to secure the payment and performance of Stamping's obligations under the Commercial Lease Agreements, including the liquidated amounts of the two judgments obtained by Leasing One. *See* Leasing

One's Amended Cross-claim, ¶ 7. The security interest was perfected on July 3, 2003. *See* Leasing One's Amended Cross-claim, ¶ 8.

55.   The Magistrate recommended confirmation of the arbitration award. *See* Docket at 26.

56.   On August 25, 2005, this Court adopted the Magistrate's Recommended Findings of Fact and Conclusions of Law. *See* Docket at 32.

57.   Anson Stamping Company, LLC and Anson Machine & Manufacturing, LLC were collectively named "Supplier" under a parts sourcing agreement with the General Electric Company ("GE"), as "Buyer," executed on March 17, 1999, effective January 1, 2001 (the "Parts Sourcing Agreement"). (Magistrate's Recommended Findings of Fact, Conclusions of Law and Recommendation, docket 26; Exhibit 5, Deposition of John Anson [("Anson Depo.")], Vol. II, Exhibit 38.)

Thus, the relevant timeline is as follows:

- March 17, 1999—GE, Stamping and Machine execute the Parts Sourcing Agreement, which replaces the then-existing parts sourcing agreement. (Ex. E hereto.)

- December 24, 1999—In connection with a loan of $1 million by Bank One to Stamping, Stamping executes the Stamping Revolving Note and the Stamping Commercial Security Agreement. (*See* discussion *supra*.)

- April 30, 2000—Stamping renews the Stamping Revolving Note. (*See* discussion *supra*.)

- May 8, 2000—A financing statement is filed with respect to the collateral described in the Stamping Commercial Security Agreement. (*See* discussion *supra*.)

- June 15, 2000—Stamping enters into a lease with Leasing One, taking a purchase-money security interest in the equipment leased. Stamping will eventually default on this lease and three others, forming the basis for a later judgment against Stamping. (Leasing One Memo. at 4.)

- prior to November 15, 2000—The Revolving Note and Term Note are in default. (*See* discussion *supra*.)

- November 15, 2000—Bank One extends the terms of the Revolving Note and the Term Note and Stamping executes the Stamping Guaranty and the Stamping Security Agreement. (*See* discussion *supra*.)

- December 15, 2000—A financing statement is filed in connection with the Stamping Security Agreement. (*See* discussion *supra*.)

- February 3, 2003—Leasing One obtains a judgment against Stamping and John Anson individually. (Leasing One Memo. at 5.)

- June 11, 2003—Leasing One obtains a supplemental judgment against Stamping and John Anson. (*Id*.)

- June 17, 2003—Stamping executes a security agreement in favor of Leasing One to secure the amounts owing under the judgments. (*Id*.)

## ARGUMENT

**I.**    **The Undisputed Facts Present a Contemporary Commercial Financing Transaction Evolving Over a Period of Time to Protect and Preserve the Enterprise Value.**

As stated by Magistrate Whalin in his Findings of Fact, Conclusions of Law and Recommendation, for thirty-seven years, John Anson ("Anson"), through one entity or another, had been a parts supplier for the Appliance Division of GE. In 1992, GE began production of a new model of refrigerator. GE officials inquired if Anson could develop stamping operations for the refrigerator. Anson incorporated Anson Stamping Company, Inc., the predecessor of Stamping, and began production with $11 million borrowed from GE to purchase equipment and obtain plant space in Louisville.

John Anson had owned Machine since 1965. It was a machine shop—forming metal parts out of "hunks of steel and chips." Stamping was created by Anson at GE's insistence specifically for the stamping contract with GE, but GE required Anson to "pledge" Machine to

the project as well. (Anson Depo., Vol. I, p. 112, line 14, p. 113, line 23.) John Anson was the sole shareholder of Anson Machine, Inc., the predecessor of Anson Machine & Manufacturing, LLC, and of Anson Stamping, Inc., the predecessor of Anson Stamping, LLC. (Anson Depo., Vol. I, p. 6, ln. 14-16, p. 21, ln. 1-4)

The first contract with GE took effect on June 7, 1993. That contract was superseded by a Parts Sourcing Agreement executed in May of 1995, and then another Parts Sourcing Agreement in 1997. The last Parts Sourcing Agreement was executed on March 17, 1999, effective January 1, 2000, and referred to herein as the Parts Sourcing Agreement. (Findings of Fact, Conclusions of Law and Recommendation at docket 26; Anson Depo., Vol. II, Ex. 38.). According to John Anson, GE required Machine to be a party to the Parts Sourcing Agreement and the agreement itself corroborates this fact. (Anson Depo., Vol. I, p. 15, ln. 24, p. 16, ln. 7; Anson Depo., Vol. I, p. 73, ln. 21, p. 75, ln. 3.) The Parts Sourcing Agreement, and each of its predecessors, was made and entered into between GE as "Buyer" and Stamping and Machine, collectively, as "Supplier." (Anson Depo., Vol. II, Exhibit 38 thereto.)

So interrelated were Stamping and Machine in connection with the Parts Sourcing Agreement, had Machine collapsed Stamping would have collapsed. (Anson Depo., Vol. I, p. 74, ln. 4-19.) In and after 1999, Anson procured financing for all of the entities through different means. Substantial amounts were borrowed from Bank One, and equipment was financed by Leasing One. Ultimately, by the relevant time periods of 1999 and 2000, Machine, which had historically serviced Stamping in the performance of the GE Parts Sourcing Agreement, was financially troubled due to issues with GE. (Anson Depo., Vol. I, p. 22, ln. 10,

p. 23, ln. 8) However, Stamping had a healthy financial statement solely as a result of the GE Parts Sourcing Agreement (Cooper Depo., Exhibit 11 thereto, Exhibit 7).

In November of 2000, when, the Term Note and Revolving Credit Notes were about to come due, Bank One granted extensions. Although Machine's financial condition was poor, the enterprise that contributed to the performance of the GE contract had value as reflected in Stamping's financial statement. Moreover, Anson had a letter of intent to sell Stamping for over $15 million. (Cooper Depo., Exhibit 7 thereto, letter from Rowe Hamilton.) Therefore, in exchange for the extensions, Bank One required a guaranty from Stamping secured by Stamping's assets, including what would become the GE Proceeds. In December of 1999, the Bank had extended a $1 million line of credit to Stamping, although $500,000 was used to repay the Bank for a loan made to John Anson personally for an injection of working capital needed by Machine. Notwithstanding Leasing One's attempts to compartmentalize these entities, their assets and their financial lives, they were all part of the "enterprise," and the life's blood of the enterprise was the Parts Sourcing Agreement.

The Stamping/Chase Transactions which are the subject of this lawsuit supported the enterprise and protected and preserved its value. Financing structures similar to that employed by Chase and the Anson entities are ordinary and commonplace in contemporary business and banking. In interpreting Kentucky Statute §§ 1906, 1907 and 1907a, the predecessor of KRS 378.010, for purposes of determining whether a conveyance was fraudulent as to creditors, the Kentucky courts have held that a chief consideration is whether the conveyance occurred in a normal manner universally adopted by mankind in general when engaged in similar transactions for bona fide purposes. *Gillardi v. Henry*, 113 S.W. 2d 1158 (Ky. 1938). Further, to suggest that

Stamping obtained no indirect benefit, if not a direct benefit, from the Stamping/Chase Transactions, is to ask this Court to suspend disbelief and turn back the calendar one hundred years. *See In re Augie/Restivo Baking Co., Ltd.*, 87 B.R. 242 (Bankr. E.D.N.Y. 1988; *In re J. Lynn Jones*, 37 B.R. 969 (Bankr. N.D. Tex. 1984); *In re Alexander Dispos-Haul Systems, Inc.*, 36 B.R. 612 (Bankr. D. Or. 1983). These transactions are consistent with bona fide contemporary business and banking practices involving an enterprise consisting primarily of multiple entities, each owned solely by one individual, all of whom are primarily engaged in the operation of the enterprise—in this case, the performance of the Parts Sourcing Agreement. The structure of the financing served legitimate business purposes and preserved the value of the enterprise for its creditors and its owner to the extent of the equity value.

## II.    Leasing One is not entitled to summary judgment that the Stamping/Chase Transactions are void *ab initio* under KRS 378.020.

In seeking summary judgment, Leasing One asserts that there is no genuine issue of material fact that when Chase approved and funded a $1 million line of credit in favor of Stamping in September, 1999, it did not give Stamping valuable consideration for the Stamping Commercial Security Agreement it received in exchange, thus rendering the Stamping Commercial Security Agreement void *ab initio* under KRS 378.020. Particularly, Leasing One argues that $500,000 of the loan proceeds were used "to reimburse John Anson for his personal injection of working capital into Machine and/or Industries," and that a credit approval form prepared in April of 2000, when the line of credit was renewed, states that the original purpose of the line of credit was to finance a capital injection into Industries.[4] Leasing One argues that in

---

[4] As will be discussed below, the credit approval summary completed when the line of credit was originally advanced stated that the remaining $500,000 was to be used for operating capital of Stamping.

order for consideration to be "valuable" it must be adequate, and that because Machine and/or Industries received the proceeds of the line of credit, or received at least $500,000 of the proceeds, Stamping did not receive "valuable consideration."[5]   Similarly, Leasing One argues that there is no genuine issue of material fact that on November 15, 2000, when Chase renewed and extended the Term Note and the Revolving Credit Note having an aggregate outstanding balance owed of approximately $3 million, and pursuant to which Stamping was not previously obligated, Stamping did not receive valuable consideration for the Stamping Guaranty and Stamping Security Agreement it gave in exchange.   It is apparent, therefore, that Leasing One's claims that the Stamping/Chase Transactions are constructively fraudulent under KRS 378.020, rely upon a concept of "valuable consideration" that incorporates notions of equivalency and mutuality that Kentucky law does not recognize in the context of guaranties and security interests.   Indeed, if the true concept of "valuable consideration" under Kentucky law is applied

---

[5] Leasing One cites *Daniels v. Harp*, 190 S.W.2d 664, 666 (Ky. 1945), for the proposition that consideration must be adequate to be "valuable" consideration under KRS 378.020. (Leasing One Memorandum at 17.) *Daniels*, however, only discusses inadequacy of consideration as a badge of fraud, not as it relates to "valuable consideration" as used in KRS 378.020. *See Daniels*, 190 S.W. 2d at 665-66 ("[W]here the transaction attacked for fraud is without consideration, or grossly inadequate consideration, or where the transaction is between members of the family of the one alleged to be guilty of the fraud, or between persons occupying a confidential relation, then the rule contended for does not prevail, since in such cases the burden is shifted to those seeking to uphold the transaction to prove that it was bona fide and not subject to attack."). Rather, as discussed in this section, Kentucky courts that have specifically addressed the standard of KRS 378.020, rather than badges of fraud for KRS 318.010, focus upon the entire lack of valuable consideration.

In addition, one of the cases that Leasing One relies upon with respect to the reasonably equivalent value standard, *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 224 B.R. 27 (6th Cir. BAP 1998), turns on Ohio law.   In that case, the court applied the Uniform Fraudulent Conveyance Act version of the Ohio statute, despite the fact that had subsequently adopted the Uniform Fraudulent Transfer Act in 1990.   *Id*. at 29 n.3.   As noted in Leasing One's Motion In Limine, such uniform acts differ from the Kentucky fraudulent conveyance statutes "in significant respects." (Leasing One's Motion in Limine to Exclude the Testimony and Report of Christopher Hirshfeld at 7.)

to undisputed facts in this case, Leasing One is not entitled to summary judgment on its claims under KRS 378.020 because (1) Chase is entitled to summary judgment dismissing such claims with prejudice, or, at a minimum, (2) genuine issues of material fact exist which preclude entry of summary judgment in favor of Leasing One.    Certainly, if Kentucky law interpreting "valuable consideration" does incorporate requirements of equivalency and mutuality as Leasing One's arguments suggest, there exist  genuine issues of material fact as to whether Stamping received valuable consideration for the Stamping/Chase Transactions, and such issues of fact precludes entry of summary judgment in favor of Leasing One under KRS 378.020.

> **A.    In the case of the Stamping/Chase Transactions, "valuable consideration" under KRS 378.020 means only such consideration as is necessary to support a simple contract, and does not incorporate requirements of equivalency and mutuality as suggested by Leasing One's arguments.**

In effect, Leasing One argues that unless Stamping received direct, dollar for dollar, benefit from the $1 million line of credit and the approximate $3 million funded under the Term Note and the Revolving Credit Note and outstanding at the time Stamping executed the Stamping Guaranty and the Stamping Security Agreement, Stamping did not receive "valuable consideration" for the Stamping/Chase Transactions.    Notwithstanding its reliance on KRS 378.020, and notwithstanding that Stamping is not, and has never been, in bankruptcy, such an argument effectively asks this Court to apply the consideration standard embodied in the fraudulent transfer provision of the Bankruptcy Code instead of the one embodied in KRS 378.020, which states in pertinent part:

> Every gift, conveyance, assignment, transfer or charge made by a debtor, of or upon any of his estate <u>without valuable consideration therefor</u>, shall be void as to all of his then existing creditors, but shall not, on that account alone, be void as to creditors whose

> claims are thereafter contracted, nor as to purchasers from the
> debtor with notice of the voluntary alienation or charge.

The fraudulent transfer provision under the Bankruptcy Code, 11 U.S.C. § 548(a)(1), which is simply not applicable here for the simple reason that Stamping is not, and has never been, in bankruptcy, states in pertinent part:

> (a)(1)  The trustee may avoid any transfer . . . of an interest of the
> debtor in property, or any obligation incurred . . . by the debtor that
> was made or incurred on or within 2 years before the day of the
> filing of the petition, if the debtor voluntarily or involuntarily –
>
> (B)(i)  <u>received less than a reasonably equivalent value</u> in
> exchange for such transfer or obligation; and . . . ."

Whether the Stamping/Chase Transactions were constructively fraudulent must be determined by whether they were made without valuable consideration, and not whether they were made for less than reasonably equivalent value.

Kentucky courts have relied upon the literal phrasing "without valuable consideration." For example, in *Coy v. Pursifull*, 249 Ky. 57, 60 S.W.2d 93 (Ky. 1933), the court described the statute that would become, without alteration, KRS 378.020, as a statute that "relates solely to voluntary conveyances <u>wholly without consideration</u>." *Id.* at 95 (emphasis added). In addition, Kentucky courts have both long ago and recently concluded that a bare obligation—a husband's obligation to support his wife and child—constituted sufficient consideration to avoid characterization as a constructively fraudulent transfer under KRS 378.020 or its predecessor. *Schilling v. Montalvo (In re Montalvo)*, 333 B.R. 145, 149 (Bankr. W.D. Ky. 2005); *Falkner v. Jennings*, 3 Ky. L. Rptr. 475, 11 Ky. Op. 399 (1881) *available at* 1881 WL 8188.

Furthermore, under Kentucky law, "valuable consideration" means with such consideration as is necessary to support a simple contract, and does not incorporate requirements

of equivalency and mutuality as Leasing One would have this Court believe. In determining whether transfers are fraudulent conveyances, courts have long recognized that absolute conveyances, such as deeds or the payment of money, which convey or transfer all of the transferor's interest in whatever is conveyed, must be distinguished from mortgages, chattel mortgages and security interests, which merely create a lien on the transferor's property. The reason for this distinction is simple. In the case of absolute conveyances or transfers, such as deeds or the payment of money, in the absence of setting aside the conveyance or transfer as fraudulent conveyance, the transferor's other creditors are unable to reach any part of the property that was transferred. On the other hand, the giving of excess security by the mortgagor to secure the mortgagor's debt to the mortgagee does not amount to a fraudulent conveyance because such excess security is available to the mortgagor's other creditors (i.e., the mortgagor's equity in the mortgaged property).

Applying Kentucky Statutes § 1907, as KRS 378.020 was then codified, the Court, in *Lameraux, et al. v. Dixie Motor Co.*, 263 Ky. 67, 91 S.W. 2d 993 (1936), applied the "valuable consideration" standard. In *Lameraux,* a husband granted his wife a mortgage on certain real estate to secure a loan of $800.00 from the wife to the husband. *Id.* at 994. The wife recorded the mortgage almost one year prior to the date her husband became indebted to the competing creditor, Dixie Motor Company. In upholding the validity of the mortgage from the husband to his wife, the court, *without* comparing the amount of the secured debt to the value of the mortgaged property, held:

> The mortgage of Lameraux to his wife, though he was insolvent, was for *a valuable consideration*; therefore it was not fraudulent within the purview of § 1907.

*Michigan Trust Co. v. Bennett*, 106 Mich. 381, 64 N.W. 330 (1895); *Haring v. Hamilton*, 107 Wis. 112, 82 N.W. 698 (1900); 37 Am Jur 2d Mortgages § 50 (2001).

The above rationale was adopted by the Kentucky Court of Appeals in *Farmers' Bank of Fountain Run v. Hagan, et al.*, 242 Ky. 535, 46 S.W. 2d 1084 (1932).[6] In that case, a husband executed a deed conveying 125 acres of land to his wife. The husband's creditors attacked the transfer as fraudulent. *Id.* at 1086-1087. The Court, however, found that the wife had a valid and subsisting debt against her husband to the extent of $880.00. *Id.* at 1087. Notwithstanding that the 125 acres of land were worth significantly more than $880.00, the Court ruled that the deed from the husband to his wife was not fraudulent, but was, in reality, a mortgage, and that Ms. Hagan held a valid lien on the real estate for the sum of $880.00. *Id.* at 1087-1088. The Court adopted the same rationale that was expressed in the above-cited cases from other jurisdictions, stating:

> In the case of *Short v. Tinsley*, 58 Ky. (1 Metc.) 397, 71 Am. Dec. 482, it is said: "But in equity, when a security or conveyance is set aside as constructively fraudulent, it is upheld in favor of one not guilty of any actual fraud to the extent of the actual consideration, and is vacated only as to the excess.

Thus, in the case of mortgages, chattel mortgages and security interests, if the transferee has given actual consideration, even if the transfer is otherwise deemed fraudulent, it does not amount to a fraudulent conveyance to the extent of the actual loan, and is vacated only as to the excess.

---

[6] Ironically, *Farmers' Bank* was cited by Leasing One for the proposition that generally, pre-existing indebtedness is sufficient consideration to uphold a conveyance given in payment of or as security for such indebtedness.

The intent expressed by the Kentucky General Assembly in adopting the Uniform Commercial Code (UCC) in Kentucky is consistent with this position. Kentucky adopted the UCC in 1958, *see* 1958 Ky. Acts Ch. 77, and recently updated Article 3 1996, *see* 1996 Ky. Acts Ch. 130, and in 2006 *see* 2006 Ky. Acts Ch. 242. Unlike KRS 378.020 which has existed, in a form similar to its current wording since at least 1858,[7] the purposes and policies of the UCC include:

> (a) to simplify, clarify and modernize the law governing commercial transactions;
>
> (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; ...

*See* KRS 355.1-102.

Third-party guaranties secured by security interests or real estate mortgage liens, and the use of other accommodation instruments, are a routine part of modern commercial transactions. In discussing the need for Accommodation Parties, in 6 William D. Hawkland & Lary Lawrence, Hawkland UCC Series § 3-419; 1 [Rev. (Westlaw 2008) (hereinafter, Hawkland), it is observed:

> A Bank or other lender may be unwilling to make a loan to a borrower if it can look only to the borrower for repayment. Unless the borrower has sufficient real or personal property to offer as security, the lender may find that the anticipated return on the lent capital is outweighed by the risk of the borrower's insolvency. The lender (known as the "creditor") may be willing to make a loan if a more financially responsible person (known as the "surety") agrees to assume liability along with the borrower (known as the "debtor") for repayment of the loan.

---

[7] *See Enders v. Williams*, 1 Met. 346 (Ky. 1858) at 1858, W.L. 4921 at *6 (discussing "modern" legislation concerning voluntary conveyances as fraudulent).

To adopt Leasing One's argument that to preclude avoidance under KRS 378.020, effectively, the grantor of a security interest must himself receive reasonably equivalent value in exchange therefor would make every accommodation guaranty or security interest securing an accommodation guaranty susceptible to being set aside as a fraudulent conveyance if, at the time of the granting of the guaranty and the security interest, the accommodation party had existing creditors, regardless of whether the accommodation party was solvent or insolvent at the time of the granting of the guaranty and the security interest.

To accomplish the stated purposes of the UCC, the drafters of the Code relaxed traditional contract law that required that consideration be received by the accommodation party to support the enforceability of the accommodation instrument. As noted in Hawkland [Rev. § 3-419:2]:

> If an instrument is issued for value given for the benefit of a party to the instrument ("accommodated party"), and another party to the instrument ("accommodation party") signs the instrument for the purpose of incurring liability on the instrument without being a <u>direct</u> beneficiary of the value given for the instrument, the instrument is signed by the accommodation party "for accommodation." UCC § 3-419(b); UCC § 3-419, Official Comment 2.

Further, Hawkland [Rev. § 3-419:7] explains that:

> The accommodation party may be paid for undertaking liability on the instrument, or he may do so gratuitously. A gratuitous accommodation party may attempt to raise failure of consideration as a defense to his liability on the instrument. However, if the accommodation party were permitted to raise his own failure to receive consideration as a defense, the holder's purpose to require the signature of the accommodation party would be undermined. To protect the reasonable expectations of the holder, Section 3-419(b) provides that the accommodation party's obligation may be enforced whether or not the accommodation party receives any consideration. UCC § 3-419, Official Comment 2. The obligation is supported by any consideration *given to the accommodated*

party.  *Id.*    Any consideration sufficient to uphold the accommodated party's contract is sufficient to uphold the <u>accommodation party's promise</u>.  Consideration is present where the holder has sold goods, made a loan, granted an extension or <u>made some other concession to the accommodated party</u>.  UCC § 3-415, Official Comment 3 (1989).

On the other hand, where the accommodation party signs the instrument after the consideration has flowed to the accommodated party and no extension of time or other concession is made by the holder, no consideration has been received by the accommodation party under <u>traditional contract law</u>.    However, even in this situation, the defense of want of consideration is unavailable to the accommodation party.  UCC § 3-419, Official Comment 2.  Under § 3-303(b), if the instrument is taken for value, it is supported by consideration.  Value can mean the taking of the instrument for an antecedent claim <u>of any person</u>, which includes an antecedent debt of the <u>accommodated party</u> UCC § 3-303(a)(3).

Under the UCC, the same liberal policies apply to determine whether a security interest is enforceable against the debtor and <u>third parties</u>.  KRS 355.9-203(2) states in pertinent part:

(2)    Except as otherwise provided in Subsections (3) to (9) of this Section, a security interest is <u>enforceable</u> against the debtor and <u>third parties</u> with respect to the collateral, only if:

(a) Value has been given.

In discussing what constitutes "value" necessary to support the granting of a security interest, Professors Leibson & Nowka, in Leibson & Nowka, *The UCC of Kentucky* §9.03[2][a], state:

The secured party must give value before the security interest can attach.  KRS 355.9-203(1)(2)(a).  "[A]" person gives "value" for rights if he acquires them … (d) generally, <u>in return for any consideration sufficient to support a simple contract</u>." KRS 355.9-201(44) … A valid security interest can be created when a debtor grants a security interest to secure a debt previously incurred or a debt past due.  This is an important tool for creditors. For example, suppose lender loans debtor $10,000.00 with repayment due in six months.  Three months later, lender learns that debtor, although not in default, is having financial difficulties. Lender asks debtor to grant it a security interests to secure

> repayment of the $10,000.00. If debtor agrees and grants lender a
> security interest, the pre-existing debt satisfies the value
> requirement.

Should the Court have any concern that application of the UCC as adopted in Kentucky is not appropriate here in a dispute involving KRS 378.020, Kentucky courts have held that to the extent, if any, that the language of KRS 378.020 conflicts with the provisions of the UCC, the UCC, being a comprehensive scheme of legislation and having been enacted years after KRS 378.020, controls. *Fiscal Court of Jefferson County v. City of Anchorage,* 393 S.W. 2d 608 (Ky. 1965). However, even prior to the adoption of the UCC in Kentucky, the rule in Kentucky was that an agreement by a lender to forebear from exercising its remedies under existing loan documents was sufficient consideration to support an new guaranty from a third party to secure the pre-existing indebtedness owed by the borrower. *See Citizens Unions Nat. Bank v. Klein,* 260 Ky. 730, 86 S.W. 2d 691 (1935). In addition, even under the cases construing the Bankruptcy Code, the courts have recognized the importance and validity of modern commercial transactions and established the proposition that, for the purposes of the Bankruptcy Code, indirect benefits to a corporate guarantor may be sufficient to sustain a guarantee against attack from being made for inadequate consideration. *Rubin v. Manufacturers Hanover Trust,* 661 F.2d 979 (2d Cir. 1981); *Klein v. Tabatchnick,* 610 F.2d 1043 (2d Cir. 1979).

To summarize this important point ignored by Leasing One, in Kentucky, a guaranty or a security interest that is granted for "valuable consideration" cannot be set aside as constructively fraudulent under KRS 378.020. In the case of guaranties, mortgages, chattel mortgages and security interests, "value" or "valuable consideration" includes any consideration sufficient to support a simple contract including an agreement by a lender to forebear from exercising its remedies under existing loan documentation evidencing pre-existing indebtedness owed by a

third-party borrower. The consideration may take the form of indirect benefits to a corporate guarantor or grantor of a security interest to secure the indebtedness of its corporate affiliate, the borrower. Therefore, if Stamping, in return for guaranteeing the indebtedness of Machine and securing the guaranty with security interests in the assets of Stamping, procured Bank One's forbearance from the exercise of remedies under the Term Note or the Revolving Credit Note owed by Machine, or received indirect benefits that constituted consideration sufficient to support a simple contract, the security interests granted by Stamping to Chase cannot be set aside as fraudulent conveyances under KRS 378.020.

**B.    Stamping received valuable consideration in exchange for the Stamping/Chase Transactions.**

Here, no dispute exists as to the fact that Stamping executed the Stamping Commercial Security Agreement in connection with Bank One's extension of one million dollars in credit. (*See* Cooper Aff. Exs. J, K.) Similarly, no dispute exists that Bank One agreed to forbear from exercising available remedies arising from defaults of Machine and Industries under the Term Note and the Revolving Credit Note in exchange for Stamping's execution of the Stamping Guaranty and the Stamping Security Agreement. (*See* Second Amendment to Borrower Documents, Cooper Depo. Ex. 10, Credit Approval Summary, Cooper Depo. Ex. 11, Exhibit 2.) Such consideration is sufficient to support a simple contract, e.g. support the Stamping/Chase Transactions. (*See* KRS 355.3-419(2); *id.* at 355.9-203; *id.* at 355.1-204.) Therefore, such consideration constitutes "valuable consideration" under KRS 378.020.

But even if such consideration is not deemed "valuable consideration" required under KRS 378.020, Stamping, as a critical part of the enterprise, received ample indirect benefits from the Chase/Stamping Transitions. Courts generally refer to transactions such as those at issue—

where an affiliate of a corporation guarantees, or pledges assets to secure the debt of, the corporation—as "cross-stream" transactions. *See Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide Ltd.)*, 139 F.3d 574, 577-78 (7th Cir. 1998). Such transactions are a routine business practice and are generally not made to frustrate creditors. *Id.* In addressing such claims under the Bankruptcy Code and state statutes based upon the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act, courts have recognized the economic reality of contemporary financing practices and have held that indirect benefits from the challenged transaction constituted reasonably equivalent value, the standard imposed under those statutes. *See id.* (citing numerous cases); *see also* a *Nat'l Century Financial Enters., Inc. v. Biomar Technologies, Inc. (In re Nat'l Century Financial Enters., Inc.)*, 341 B.R. 198 (Bankr. S.D. Ohio 2006). Even reasonably equivalent value, as used in the Bankruptcy Code and UFTA or UFCA-based state statutes, does not require "penny for penny" exchange. *Nat'l Century*, 341 B.R. at 214. In addition, these cases suggest that questions of reasonably equivalent value must be evaluated <u>as of the time the transfer or obligation is made</u>, rather than applying advantages of hindsight that were unavailable to the parties at the time. *See Butler Aviation International, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1126 (5th Cir. 1993). Indirect benefits sufficient to provide reasonably equivalent value vary and can take a number of forms, including goodwill or safeguarding an important source of supply or an <u>important customer</u>. *Leibowitz*, 139 F.3d at 578.

1. **When Valued as of the Time of the Transactions, Stamping Received Valuable Consideration in Each of the Transactions at Issue.**

Here, Stamping realized significant indirect benefits from the transactions in question in Stamping's safeguarding the relationship between the enterprise and its customer, GE, that

accounted for over 90% of Stamping's sales. Similar indirect benefits were involved in *Butler Aviation International, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119 (5th Cir. 1993). In *Butler*, Fairchild Aircraft Corporation and Air Kentucky Airlines were affiliates, each having the same corporate parent. *Id.* at 1123. Fairchild saw USAir as a prime potential customer due to an agreement between Air Kentucky and USAir to operate as a commuter airline in Indiana and Kentucky. *Id.* For that reason, Fairchild sold three airplanes to Air Kentucky on terms favorable to Air Kentucky. *Id.* Fairchild hoped that the favorable terms of the sales would assist Air Kentucky's financial situation, permit Air Kentucky to cement its relationship with USAir, and result in a long-term relationship between Fairchild and USAir. *Id.* Air Kentucky's financial picture, however, did not improve. *Id.* Consequently, USAir indicated that it would terminate its agreement with Air Kentucky unless it was sold to a financially stable entity. *Id.* At the same time, Air Kentucky's fuel suppliers refused to provide fuel on credit. *Id.* Fairchild, fearful that the grounding of Air Kentucky would destroy any hopes of future sales and seriously damage Fairchild's potential long-term relationship with USAir, paid Air Kentucky's fuel invoices. *Id.* at 1124. Ultimately, no buyer for Air Kentucky materialized, and nine months later Fairchild entered bankruptcy, where it sought the return of the amounts it had paid for Air Kentucky's fuel under section 548 of the Bankruptcy Code. *Id.*

The trial court held that Fairchild had received reasonably equivalent value in exchange for payment of Air Kentucky's fuel invoices. In upholding that decision, the appellate court noted that keeping Air Kentucky in business prevented serious damage to Fairchild's relationship with USAir, as USAir would have attributed much of Air Kentucky's failure to Fairchild, given the financial relationship between the two. *Id.* Further, by keeping Air Kentucky flying,

Fairchild maintained the possibility of a sale of Air Kentucky to another party, which may have resulted in recoupment of Fairchild's investment in Air Kentucky and a customer relationship with the "new" Air Kentucky. *Id.* Consequently, the court held that the indirect benefits to Fairchild flowing from the relationships with USAir and Air Kentucky constituted reasonably equivalent value for the amounts Fairchild paid for Air Kentucky's fuel. *Id.* at 1127.

Similarly, in this case, Stamping's transactions allowed Machine to continue as a financially viable entity, which prevented a breach of the GE Parts Sourcing Agreement, and allowed Stamping to maintain an indispensible business relationship. No dispute exists that GE's relationship with Stamping was vital to Stamping's success. GE's orders constituted over ninety percent of Stamping's business, including years in which GE's orders constituted ninety-seven percent, ninety-nine percent and ninety-eight percent of Stamping's business. (Christopher C. Hirschfeld, Report of Lighthouse Advisors at 3, 19-20 [hereinafter "Lighthouse Report"], Exhibit 6.) In essence, Stamping was a "satellite operation" of GE entirely dependent upon the relationship with GE. (Anson Depo., Vol. II., p. 183, ln 24; *id.*, p.185, ln 6.) Without the GE contract, Stamping would have lost most, if not all, of its worth as a company—an amount that at the time of the transactions greatly exceeded Stamping's exposure to Chase arising from the Stamping/Chase Transactions. (*See* Lighthouse Report at 19-20.)

Further, although there may be dispute as to the extent of Machine's importance to Stamping in the performance of the GE Parts Sourcing Agreement, there is evidence that Machine played a significant role. Machine's importance to the GE relationship had at least two elements. First, as an initial matter, GE's requirement that Machine be included in the Parts Sourcing Agreement insured Anson's full participation in an important project for GE. (Anson

Depo., Vol. II., p. 183, ln 2-8; *id.* at 112, ln 10-16.)  Stamping did not exist when John Anson

first agreed to perform the parts stamping work for GE.  (Anson Depo., Vol. II, p. 112, ln. 14, p.

113, ln. 23.)  GE had prior experience with Anson and Machine, having worked with them

before, and approached the entities it knew when it sought Anson's commitment to the parts

stamping work.  Stamping was merely the entity created by John Anson to perform the Parts

Sourcing Agreement.  (Magistrate's Findings of Fact, docket 26; Anson Depo., *id.*)  Requiring

the known entity, Machine, to sign on with the unknown entity, Stamping, GE achieved a level

of comfort that it was getting who it wanted for the job.  (Anson Depo., Vol. I, p. 77, ln. 2, p. 78,

ln.8.)  Second, GE required that its contractors comply with stringent, detailed, and inviolable

specifications, procedures, and deadlines.  Machine was well versed in these requirements due to

its prior relationship with GE.  (*See* Anson Depo., Vol. II., Exhibit 1 thereto, Parts Sourcing

Agreement, ¶¶ 4, 5; *see also* Lighthouse Report at 3; Anson Depo., Vol. I., p. 74, ln 1-19.)

Indeed, GE so relied upon Machine's involvement, that Machine was a party in every version of

the Parts Sourcing Agreement.  (GE Parts Sourcing Agreement, at 1; Anson Depo., Vol. I., p.76,

ln 20-24.)  The result of such inclusion meant that if Machine ever ceased to be financially

viable, the entire Parts Sourcing Agreement would be in default and subject to termination by

GE.  (Parts Sourcing Agreement, Ex. B., ¶13; *see also* Anson Depo., Vol. I., p. 74, ln 1-19; *id.* p.

76, ln 6-15; *id.* p.80, ln 18-20; *id.* p.82, ln 2-3; Lighthouse Report at 20.)[8]  In short, Stamping's

---

[8] The specific portion of the agreement reads:

If Supplier ceases to conduct its operations in the normal course of business (<u>including inability to meet</u>
<u>Its obligations as they come due</u>) or if any proceeding under the bankruptcy or insolvency laws is brought
by or against Supplier, or <u>a receiver for Supplier is appointed or applied for</u> or an assignment for the
benefit of creditors is made by Supplier, Buyer may terminate this Contract where allowed by law.

(continued...)

relationship with GE, and by extension, virtually all of Stamping's value, and the enterprise's value depended upon Machine's continued viability.

The value to Stamping becomes even more apparent when one considers the specific facts as they existed at the time of the transfers. In 1999, prior to Stamping's execution of the Stamping Commercial Security Agreement, Machine was in financial jeopardy, thereby threatening the enterprise and Stamping's relationship with GE.    Machine had sustained significant losses in 1998 and 1999 (*E.g.* 8/10/1999 Credit Approval Summary [Cooper Depo. Ex. 4].)  In addition, the termination of the GE contract would likely have prevented the contemplated sale of Stamping, which had resulted, by December 10, 1999, in Anson's acceptance of a $15 million offer. (*See* Cooper Depo., at pg. 16-17, 28-29 and Exhibit 7 thereto, Letter dated December 7, 1999, from Rowe Hamilton, CPA.)  At the same time, Machine was attempting to diversify its customer base to improve its performance, but it required working capital to do so. (10/08/1999 Credit Approval Summary, Cooper Depo. Ex. 2.)  Thus, at the time of Stamping's execution of the Stamping Commercial Security Agreement, it granted a security interest to Bank One, providing Bank One with a "weak" collateral position given GE's prior security interest in Stamping's assets (12/10/1999 Credit Approval Summary, Cooper Depo. Ex. 7).  This measure provided funding to mitigate or eliminate a serious threat to Stamping's most valuable asset, thereby preserving Stamping's strong cash flow and the $15 million offer that Anson had received for Stamping (*id.*).  Moreover, the security interest secured a loan that: (a) was justified given Stamping's then existing cash flows; and (b) the parties contemplated

(...continued)

(GE Parts Sourcing Agreement, Ex. B., ¶13 (emphasis added).)

would be repaid by the proceeds of the sale of the business, to the extent the sale occurred, in less than four months.   (*Id.*; *see also* 10/08/1999 Credit Approval Summary, Cooper Depo. Ex. 2.)  In the context of the time Stamping executed the Stamping Commercial Security Agreement, the cost—granting a second-position security interest for a likely short-term debt of $1 million dollars—was more than offset by maintaining the contract that provided Stamping its strong cash flow.

Similarly, with respect to the Stamping Guaranty and the Stamping Security Agreement, Machine's financial situation had not improved by November 2000.  (*See* 10/23/2000 Credit Approval Summary, Cooper Depo., Ex. 11 thereto.)  In fact, the Revolving Note and the Term Note were in default, and Machine and Industries was unable to satisfy the accelerated debt. (*See id.*; Second Amendment to Borrower Documents; Cooper Depo., Ex. 19 thereto.)  This would mean that, absent Stamping's intervention, Machine would not be able to meet its obligations when due, in violation of the GE Parts Stamping Agreement.  (*See* Parts Sourcing Agreement, Anson Depo., Vol. II, Ex. 38 thereto.)  Notwithstanding these issues, Stamping's financing position remained strong, with an EBITDA of $4.4 million, meaning that Stamping could cover its debt as well as the entire debt of Machine and Industries.  (10/23/2000 Credit Approval Summary, at attached Credit Analysis Memorandum, Cooper Depo., Ex. 11 thereto.) Moreover, Stamping's bottom line, fueled by the GE relationship, resulted in an equity value, at the time, of $6.6 million to $13.2 million.  (Lighthouse Report at 19-20.)  Thus, at the time Stamping executed the Stamping Security Agreement and the Stamping Guaranty, the cost of taking on responsibility for the other Anson entities debt was greatly outweighed by the benefit of maintaining the lucrative GE contract.

In summary, the indirect benefit associated with maintaining an important client relationship can provide valuable consideration, and even reasonably equivalent value, in a "cross-stream" transaction, as reflected in *Butler Aviation International, Inc. v. Whyte* (*In re Fairchild Aircraft Corp.*), 6 F.3d 1119 (5th Cir. 1993). As in that case, the value here of the indirect benefit to Stamping of maintaining its dominant customer relationship, as measured at the time of the transactions, provided Stamping with valuable consideration in exchange for the Stamping/Chase Transactions.[9]

To summarize, under Kentucky law, where security interests are challenged under KRS 378.020, only consideration sufficient to support a simple contract is necessary to protect the transfer. Further, "valuable consideration" in that context incorporates no concepts of equivalency and mutuality. Under this standard, it cannot be argued that Stamping did not receive valuable consideration for the Stamping/Chase Transactions. In addition, however, Stamping received indirect benefit from those transaction in the preservation of Machine, a critical party to the Parts Sourcing Agreement, to the enterprise value, and to the $15 million value of Stamping.

---

[9] Notwithstanding the foregoing, Leasing One analogizes the current case to *Enwotwen Industries, Inc. v. Brookstone Limited Partnership (In re Newtowne, Inc.)*, 157 B.R. 374 (Bankr. S.D.Ohio,1993), and *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 224 B.R. 27 (6th Cir. BAP 1998). The analogies, however, break down upon closer examination of both cases, which hold not that indirect benefit cannot be sufficient consideration, but that the plaintiffs had not addressed evidence that demonstrated the value of the indirect benefit. Moreover, both cases were decided under statutes that employed a "reasonable equivalent value" standard.

### III.    Leasing One is not entitled to summary judgment that the Stamping/Chase Transactions are void *ab initio* under KRS 378.010, because genuine issues of material fact exist to preclude summary judgment.

Leasing One also seeks summary judgment setting aside the Stamping/Chase Transactions as intentional fraudulent conveyances under KRS 378.010. In support of its arguments, Leasing One alleges that each of the Stamping/Chase Transactions bear the following badges of fraud: (A) Stamping did not receive adequate consideration for the transactions, (Leasing One Memorandum at 20, 28); (B) Stamping was not forthcoming in acting to formalize the transfer of assets due to the delay in filing its financing statements, (*Id.* at 21, 29); and (C) Stamping, by the transactions, transferred all or substantially all of its property at a time when litigation against it was pending, (*Id.* at 21, 28-29.)[10] The Court should deny Leasing One's motion, as genuine issues of fact exist with respect to the existence of any badges of fraud and with respect to Chase's knowledge of any such intent on the part of Stamping.

### 1.    Genuine issues of fact exist as to whether Stamping received adequate consideration.

Chase submits that when applying the correct definition to "valuable consideration," there can be no dispute that Stamping received valuable consideration for the Stamping/Chase Transactions. However, as described above, the structure of the financing in contemporary

---

[10] Leasing One also hints at another badge of fraud—that Stamping was insolvent when the Stamping Guaranty and the Stamping Security Agreement were made, (*e.g.* Leasing One Memorandum at 25 ("Where a debtor becomes insolvent in an attempt to pay the debts of a struggling affiliate. . . ."); *id.* at 10 ("It is uncertain whether Stamping's assets were adequately strong to cover this additional debt . . .); *id.* at 28 (discussion of Leasing One's loss of ability to reach Stamping's assets)), notwithstanding its express assertion in its motion in limine that Stamping's solvency is irrelevant to this case, (Leasing One's Motion in Limine to Exclude the Testimony and Report of Christopher Hirschfeld at 7-8). Despite Leasing One's indirect reference to an insolvency badge, Stamping was solvent at the time of the transactions. (*E.g.* Lighthouse Report, at 19-20; Cooper Depo. Ex. 11 thereto 10/23/2000 Credit Approval Summary (discussion of Stamping's strong EBITDA at time of 2000 transaction).)

terms, the existence of an enterprise consisting of Machine, Stamping and Anson, and the indirect benefit that flowed to Stamping demonstrate that Stamping's intent was not to defraud Leasing One, but to maintain its significant value through routine financial transactions that typically are not made to defraud creditors. *See Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide Ltd.)*, 139 F.3d 574, 577-78 (7th Cir. 1998). As such, we refer to the earlier discussion with respect to the "inadequate consideration" badge of fraud.

### 2.     Stamping Did Not Convey Essentially All of Its Property at a Time When the Property Was Subject to Execution.

Leasing One also claims that the Stamping/Chase Transactions constituted a transfer of substantially all of Stamping's assets at a time when the assets were subject to execution— another badge of fraud. Although Kentucky courts consider a transfer of all or substantially all of a debtor's property subject to execution a badge of fraud, the challenged transactions merely conveyed security interests in substantially all of Stamping's personal property. A grant of a security interest is not a transfer of all of the debtor's rights in the property in which the security interest is granted, but merely constitutes a lien on the personal property.     *See* KRS 355.1-201(2)(ai).

Moreover, when a debtor makes a conveyance of substantial assets to avoid execution, the debtor typically conveys the property to a person with whom he shares a close relationship, with the fraudulent intent being that the debtor will retain de facto dominion over the property while frustrating the creditor's lawsuit. *E.g. Center v. Stamper*, 318 S.W.2d 853(Ky. 1958) (transfer to sister); *Hager v. Coleman,* 307 Ky. 74, 208 S.W.2d 518, (1948) (transfer to wife); *Smith v. Holland*, 298 Ky. 598, 183 S.W.2d 647 (1944) (same). Here, Stamping transferred property to Chase, a creditor, not to an insider or a confidant. Thus, the transactions, at worst,

indicate an intent to prefer one creditor over another, rather than an intent to defraud. Such intent, however, does not establish a fraudulent conveyance. *See Lamereaux v. Dixie Motor Co.*, 263 Ky. 67, 91 S.W.2d 993, 995 (1936).

Finally, 1999 and 2000, at the time the allegedly offending transactions occurred, Leasing One was only commencing its relationship with Stamping and had taken a purchase money security interest in the leased equipment, which primed any lien in favor of Chase as to such equipment. Leasing One would not commence litigation against Stamping until 2001, and would not obtain a judgment against Stamping until 2003. Leasing One would not secure its judgment with the competing lien until June, 2003. Typically, where courts invoke a badge of fraud with respect to a debtor's transfer of assets in contemplation of litigation, the transfer takes place almost immediately after the debtor has committed a tort, *Center v. Stamper*, 318 S.W.2d 853(Ky. 1958) (transfer the day after an explosion occurred on defendant's property); *Hager v. Coleman*, 307 Ky. 74, 208 S.W.2d 518, (1948) (transfer two days after defendant stabbed plaintiffs' father/husband), or after the debtor has been sued, *Smith v. Holland*, 298 Ky. 598, 183 S.W.2d 647 (1944) (transfer of property the day after judgment issued); *Setzer's Steel Systems, Inc. v. Chenault Development Corp.*, 725 S.W.2d 22 (Ky.App.1987) (transfer in between grants of partial summary judgments). In such circumstances, the implication is that the defendant anticipates a suit that will jeopardize all of his assets, *see generally* KRS Ch. 426, and, therefore, the defendant's transfer of its assets in anticipation of such judgment is suspect.

Here, Leasing One claims that by "November 2000,[11] Stamping . . . had reason to anticipate that Leasing One might file suit or attempt to repossess <u>the collateral</u>. . . ." (Leasing One Memorandum at 29 (emphasis added).) Whether Stamping actually anticipated such suit or repossession is questionable. (Anson Depo., Vol. II. p. 210-211.) But if, as Leasing One states, Stamping anticipated such litigation with Leasing One, arguably such litigation would implicate only the leased equipment which was subject to Leasing One's first priority purchase money security interest. Consequently, Stamping had no reason to intentionally place all its assets outside the reach of Leasing One by pledging them to Bank One.

### 3. Stamping Did Not Fail to Record, or Conceal, the Transfers Associated with the Stamping/Chase Transactions.

Leasing One asserts that Stamping was "not forthcoming in performing acts to formalize" the Stamping/Chase Transactions and that this is a badge of fraud. Leasing One bases this claim primarily upon delays in filing financing statements. The facts and circumstances, however, demonstrate that it is unreasonable to imply fraudulent intent from these facts.

A debtor's "concealment or failure to record" a transfer constitutes a badge of fraud. *Brock v. Draper (In re Draper)*, 355 B.R. 607 (Bankr. E.D. Ky. 2006). Facts establishing a failure to record are typically easily established—the transfer records do not reflect the transfer. A "concealment of a transfer" sufficient to evidence fraudulent intent, however, requires more than mere delay or neglect. For example, in *Allen v. Ligon*, 175 Ky. 767, 194 S.W. 1050 (1917), the court found evidence of fraudulent intent where the debtor waited until the day before trial was set, and sent his son to the clerk's office to record the deed, "with a request to clerk not to

---

[11] Stamping executed the Stamping Commercial Security Agreement on or around December 24, 1999. (Cooper Aff. Ex. J.)

make the deed public." *Id.* at 1052; *see also First Nat'l Bank v. Williamson*, 273 Ky. 116, 115 S.W.2d 565, 567 (Ky.1938) (holding that delay of five and one-half months due to neglect in recording was insufficient to set aside transfer as fraudulent conveyance); *Union Bank & Trust Co. v. Ponder*, 220 Ky. 365, 295 S.W. 140 (1927) (finding fraudulent intent evidenced where wife did not record deed until three months after indebtedness had been incurred); *Tabor v. Armstrong*, 99 S.W. 957 (Ky. 1907) (unreported) (finding fraudulent intent evidenced where deed was not recorded for two years and one week after debtor was adjudicated bankrupt). In fact, Kentucky "concealment" cases indicate that a delay in filing must coincide with circumstances evidencing the debtor's intent to induce the creditor's extension of credit without knowledge of the transfer.

With respect to the Stamping Guaranty and the Stamping Security Agreement, Leasing one alleges that a thirty-day delay between Stamping's granting a security interest on November 15, 2000, and recording the associated financing statement on December 15, 2000, evidences Stamping's fraudulent intent. (Leasing One Memorandum at 29.) By comparison, Leasing One filed the financing statement upon which it relies sixteen days after June 17, 2003, the day Stamping provided it with a security interest. (*Id.* at 5.) Thus, the difference in filing times between the two financing statements is fourteen days. Such a difference appears minimal when one considers that the Chase financing statement would have been sent for filing during the holiday season, a time when commercial institutions and government offices are closed for business for several days. At any rate, Leasing One has not indicated how the thirty-day delay evidences Stamping's intent to defraud Leasing One into granting credit without knowledge of the transfer, as Leasing One and Stamping had entered into their final Commercial Lease

Agreement on August 23, 2000, (Leasing One Memorandum at 3), well before the date Stamping executed the Stamping Guaranty and the Stamping Security Agreement. Accordingly, the thirty-day delay does not evidence any intent to defraud on Stamping's part.

As for the Stamping Commercial Security Agreement, Leasing One alleges that the nearly five-month delay in filing the related financing statement also evidences fraudulent intent. (Leasing One Memorandum at 21.) It assumes such a delay existed because the Stamping Revolving Note was executed on December 24, 1999, and the financing statement was recorded in May of 2000. However, although December 24, 1999 was the origination date of the Stamping Revolving Note, it was renewed following the Credit Approval granted on April 18, 2000 (Cooper Depo. Ex. 1 thereto). The May, 2000 financing statement was probably the product of the April, 2000 renewal.

Nevertheless, despite any apparent delay in filing the Chase financing statement, the circumstances do not indicate that Stamping had an intent to defraud Leasing One. Putting aside the delay, the Chase financing statement was still filed on May 8, 2000—over one month prior to the date that Leasing One and Stamping executed the second Commercial Lease Agreement, June 15, 2000.[12] (*Compare* Cooper Aff. K, *with*, Leasing One Memorandum at 3.) Thus, the transfer was recorded prior to Leasing One's extension of credit. Moreover, during the time in which Leasing One was entering into the leases, GE held a security interest in substantially all of Stamping's assets. Thus it is unlikely that Leasing One entered into the leases with the

---

[12] Leasing One and Stamping executed the first Commercial Lease Agreement on November 1, 1999. Thus, even if the financing statement associated with the Stamping Security Agreement would have been filed, without delay, on the day the Stamping Security Agreement was executed, December 24, 1999, (Cooper Aff. Ex. J), the transfer would not have influenced Leasing One's decision to extend credit on November 1, 1999.

expectation it would ever look to the non-leased property for payment. (12/10/1999 Credit
Approval Summary, Cooper Depo. Ex. 7.) Therefore, it is unlikely that Leasing One's decision
to extend credit to Stamping at the time was influenced at all by the status of non-leased
property.

### B.    Chase Had No Knowledge of Any Fraudulent Intent of Stamping.

A claim under KRS 378.010 requires proof that the transferee knew or should have
known of the transferor's fraudulent intent. *See Allen v. Ligon*, 194 S.W. 1050, 1051 (Ky. 1917).
Leasing One concedes that Chase's mere knowledge that Stamping was obligated to Leasing
One does not prove Chase had knowledge of any fraudulent intent by Stamping. (Leasing One
Memorandum at 16 (citing *McKenzie v. Oliver*, 571 S.W.2d 102, 107 (Ky. App. 1978).) Indeed,
Chase is not the guardian of Stamping's creditors. *Interstate Acceptance Corp. v. Lovins*, 380
S.W.2d 805, 808 (Ky. 1964).

However, Leasing One argues that Chase had reason to know of Stamping's fraudulent
intent due to its "knowledge" of the alleged badges of fraud. As discussed above, none of those
badges truly exist.    Rather, the circumstances reveal only that Stamping was engaged in
cross-stream transactions with Bank One, which are typical of contemporary financing practices,
*Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide Ltd.)*, 139 F.3d 574, 577-78 (7th
Cir. 1998), at the same time that it engaged in equipment lease transactions with Leasing One.
Businesses frequently obtain equipment financing from different lenders than those from whom
they obtain financing for operating capital. Accordingly, Chase's knowledge that Stamping
leased equipment from Leasing One would not give Chase any reason to suspect that Stamping
had nefarious motives when it granted a security interest in its assets to Chase. To conclude that
Chase had any reason to believe that Stamping was acting fraudulently imparts an underlying

fraudulent intent to financing practices that have been common for at least twenty-five years. *See Telefest, Inc. v. VU-TV, Inc.*, 591 F. Supp. 1368, 1379 (D.N.J. 1984). In fact, neither cross-stream transactions generally, nor the specific circumstances attending the Stamping/Chase Transactions indicate that Chase had knowledge of fraudulent intent on the part of Stamping. To briefly summarize, Leasing One has failed to demonstrate any factual basis for a claim against Chase under KRS 378.010. However, if it has, Chase has demonstrated that genuine issues of fact exist to preclude summary judgment in favor of Leasing One.

### IV.    KRS 378.020 does not apply to guaranties.

KRS 378.010 provides that the following transactions may be void *ab initio* if made with the intent to hinder, defraud or delay creditors:

> Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, or right or thing in action, or any rent of profit thereof . . . and every bond or other evidence of debt given, . . .

This statute expressly extends to an "evidence of debt," which arguably includes guaranties.

On the other hand, KRS 378.020 provides that only the following transactions may be void *ab initio* if made for lack of valuable consideration: "gift, conveyance, assignment, transfer or charge made by a debtor, of or upon his estate." Unlike KRS 378.010, KRS 378.020 makes no mention of evidences of debt or any other category of transaction that conceivably includes a guaranty. Therefore, based on a literal reading of the statute the Kentucky Legislature intended that KRS 378.020 not extend to guaranties. Had it intended that a guaranty be void for lack of valuable consideration, it would have used the same "evidence of debt" language it used in KRS 378.010. KRS 378.020 does not apply to guaranties.

This is significant to the extent Leasing One seeks summary judgment on Count III of its Amended Cross Claim – a claim made in the alternative to its primary claim that the Stamping Commercial Security Agreement, in addition to the Stamping Guaranty and the Stamping Security Agreement, is void *ab initio* as an intentional or a constructive fraudulent transfer. In Count III, Leasing One seeks a determination that it is entitled to a credit against the Stamping Revolving Note equal to the amount of proceeds from another arbitration award in favor of Stamping that were paid to Bank One. Those proceeds were, in part, applied by Bank One to the Term Note and the Revolving Note. In its Count III, Leasing One erroneously theorizes that because the Stamping Guaranty and the Stamping Security Agreement are void *ab initio,* Chase's only right to apply those proceeds to any debt of Stamping was pursuant to the Stamping Commercial Security Agreement, which secured the Stamping Revolving Note  Therefore, it argues, Bank One should have applied those proceeds to the Stamping Revolving Note, and had it done so, or if the credit Leasing One seeks in Count III of its Amended Cross Claim is granted, the Stamping Revolving Note would be satisfied in full, and would cease to serve as a present basis for Chase to claim a right to the GE Proceeds at issue in this case.

Leasing One's argument fails, however, if the Stamping Guaranty is not void *ab initio* because, together with the Stamping Commercial Security Agreement, the Stamping Guaranty does provide a legitimate basis for the application of the prior arbitration proceeds to the Term Note and the Revolving Credit Note. The Stamping Commercial Security Agreement, which in the context of Count III has necessarily survived all other counts of Leasing One's Amended Cross Claim,  provides that it secures the "Indebtedness" which is defined to include the indebtedness evidenced by the Stamping Revolving Note, and, "all other obligations, debts and

liabilities, plus any accrued interest thereon, owing by Grantor , . . . to Lender of any kind or character, now exiting or hereafter arising, as well as all present and future claims by Lender against Grantor . . . whether such indebtedness arises by note, draft, acceptance, guaranty, . . . ." The Stamping Guaranty, of course, guarantees the debt owed under the Term Note and the Revolving Credit Note. Therefore, unless the Stamping Guaranty is declared void *ab initio*, it, together with the Stamping Commercial Security Agreement, provides a sound legal basis for Bank One to have applied the proceeds of the prior arbitration to the Term Note and the Revolving Credit Note notwithstanding a determination that the Stamping Security Agreement is void *ab initio,* and a sound legal basis to overrule Leasing One's motion with respect to Count III. Because the Stamping Guaranty, as a matter of law, cannot be void *ab initio* under KRS 378.020, Leasing One must carry its burden of proof that it is void *ab initio* under KRS 378.010 in order to prevail under Count III. Leasing One's Motion should be denied as to Count III to the extent it relies on the avoidance of the Stamping Guaranty under KRS 378.020.

## CONCLUSION

The transactions between Bank One, Machine, Industries and Stamping in 1999 and 2000 are representative of ordinary commercial financing transactions in contemporary commercial times. The Kentucky Legislature and the Kentucky courts, as well as courts and commentators elsewhere in the country, have acknowledged and enforced such transactions in the face of fraudulent transfer statutes. Leasing One's arguments fail to acknowledge changes in Kentucky law over the past century even as Kentucky courts have embraced them. In determining whether a transfer is fraudulent under KRS 378.010 or 378.020, Kentucky courts recognize the need to view the overall transaction in terms of commonplace commercial practices. They recognize the difference between outright conveyances and grants of security interests and guaranties in the

context of fraudulent transfers. They recognize the purpose and intent underlying the UCC as adopted in Kentucky. And, in order to protect a transfer in the face of KRS 378.020, they require no consideration greater than that needed to support a simple contract when overruling attacks on security interests. They recognize as valuable consideration the indirect benefits that flow to all aspects of an enterprise from financing provided only to one.

In 1999 and 2000, Anson Stamping, Machine and Industries constituted an enterprise engaged in the production of appliance parts for GE. If one stumbled, they were all at risk. If the contract was lost, they were all lost. If the contract was preserved, they all survived, and $15 million was at stake. To view this case any other way is at best, naive, and at worst, an act of intellectual dishonesty. At the very least, the complexity of the facts relevant to the merits of Leasing One's claims present genuine fact issues in the context of modern commercial practices, and summary judgment in favor of Leasing One must be denied.

Respectfully submitted,

WYATT, TARRANT & COMBS, LLP

/s/ Mary L. Fullington
Mary L. Fullington
250 West Main Street, Suite 1600
Lexington, Kentucky  40507-1746
Telephone:  (859) 233-2012
Facsimile:  (859) 259-0649
E-mail:  Lexbankruptcy@wyattfirm.com

Donald J. Kelly
500 West Jefferson Street, Suite 2800
Louisville, KY  40202-2898
Telephone:  (502) 589-5235
Facsimile:  (502) 589-0309
E-mail:  dkelly@wyattfirm.com
E-mail:  mmcclain@wyattfirm.com

COUNSEL FOR JPMORGAN CHASE BANK, N.A.

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2008, I electronically filed the foregoing Memorandum in Support of JPMorgan Chase Bank, N.A.'s Motion for Summary Judgment with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:   Victoria E. Boggs, vboggs@weberandrose.com; Darryl William Durham ddurham@weberandrose.com; John David Dyche, jddyche@fmhd.com, awhittam@fmhd.com, and trhodes@fmhd.com; Winston S. Evans, wevans.ef@ejrlaw.com; Michael R. Gosnell, mgosnell@weberandrose.com; Michael J. Kitchen, mjk@bmlg.com; Phillip A. Martin, pmartin@fmhd.com and cbellner@fmhd.com; and J. Bruce Miller, jbm@jbmlg.com.

/s/ Mary L. Fullington _____
Mary L. Fullington

30498271.2